2020 IL App (2d) 190371
No. 2-19-0371
Order filed April 29, 2020

NOTICE: This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| JOSEPH SEYL, as trustee of the Joseph Seyl Living Trust dated December 16, 2013, and DAWN S. SEYL, as trustee of the Dawn S. Seyl Living Trust dated December 16, 2013 | ) ) ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiffs-Appellees and, Cross-Appellants, | ) ) ) | |
| v. | ) ) | No. 17-AR-693 |
| ACHIM GROSS and JANINE BIRR, | ) ) | |
| Defendants-Appellants and Cross-Appellees. | ) ) ) | Honorable Divya K. Sarang, Judge, Presiding. |

JUSTICE McLAREN delivered the judgment of the court.
Justices Hutchinson and Bridges concurred in the judgment.

**ORDER**

¶ 1    *Held*: The trial court's finding that the landlords failed to mitigate damages was not against the manifest weight of the evidence where the landlords made a business decision to sell their house rather than relet it; where the landlords failed to prove that damage to their house was entirely caused by the tenants, the court's award of half the cost of repairs was not manifestly erroneous.   Judgment affirmed.

¶ 2    This case arises from a landlord-tenant dispute.   Plaintiffs, Joseph Seyl and Dawn S. Seyl (Landlords), sought unpaid rent and recovery for damage to the leased premises.   Defendants, Achim Gross and Janine Birr (Tenants), asserted affirmative defenses, including the Landlords' failure to mitigate damages.   After a bench trial, the court found that the Landlords failed to mitigate damages in part, after they listed the house for sale rather than reletting it, but that the Landlords were entitled to damages in the amount of $5700 for rent for the time before they listed the house for sale.   The trial court also awarded the Landlords half of the alleged property damages, or $7050; $350 for costs; and $7000 for attorney fees.

¶ 3    The Tenants appeal arguing that the trial court erred by awarding the Landlords (1) any rent due because the Landlords completely failed to mitigate damages, and (2) $7050 for property damage because the evidence does not support this finding.   The Landlords cross-appeal arguing that the trial court erred by failing to award them (1) rent due from the date of the Tenants' breach through the date of the sale of the house, (2) the entire cost to repair the damage caused by the Tenants beyond normal wear and tear, and (3) all of their attorney fees.   For the following reasons, we affirm.

¶ 4                                    I. BACKGROUND

¶ 5    On December 18, 2017, the Landlords filed a two-count complaint against the Tenants alleging the following.   The Landlords owned a single-family property on Green Ridge in Elgin (the house).   On October 3, 2012, the Tenants entered into a lease agreement (lease) with the Landlords to rent their house until February 28, 2014, for $1900 a month, plus a $1900 security deposit.   According to the lease attached to the complaint, the Tenants would "keep the residence in good repair and order (except to the extent Landlord has in this lease agreed to make repairs)." Under the terms of the lease, the Tenants had no right to sublet the property, or to make alterations,

additions, or painting to the property. The parties renewed the lease more than once. The parties executed the last renewal in March 2017 with the term ending March 15, 2018. The Tenants did not relinquish possession of the property until after August 12, 2017.

¶ 6    Count I alleged breach of lease terms; failure to pay rent. Tenants failed to relinquish the keys to the property. On September 5, 2017, the Tenants' attorney notified the Landlords by email that the Tenants relinquished the possession of the property. The Tenants failed to pay rent for the remaining seven months of the lease term, which amounted to $13,300 in unpaid rent. The Landlords "acted diligently to repair the home in getting [the house] on the market in order to mitigate the damages through a sale of the home." Under the terms of the lease, the Landlords were entitled to attorney fees and costs incurred in enforcing the lease.

¶ 7    Count II alleged damage to the house to the extent that the Landlords paid $14,150 to JHC Painting and Construction for necessary repairs to the house caused by the Tenants. The damage included significant chips in the kitchen and hallway tile; excessive wear and tear to the carpet throughout the house; nail and screw holes in the walls in need of patching prior to painting; chipping exposing the metal frame of the walls; broken blinds throughout the house; dirty kitchen appliances; damages to screens on the porch requiring replacement of the door and wall repair; replacement of doors throughout the house, including two doors that had been removed; broken garage door springs; and general filth and mold throughout the house. The Landlords also removed "significant amounts of [the Tenants'] personal property."

¶ 8    The Tenants filed an answer and affirmative defenses. After the trial court dismissed several affirmative defenses, the Tenants filed an amended answer and affirmative defenses. Tenants admitted the general allegations regarding the lease and the renewal of the lease. The Tenants denied that they would not allow the Landlords in the property until August 12, 2017.

Regarding count I, the Tenants affirmed that under the terms of the lease they were obligated to pay rent through March 15, 2018; they failed to make rent payments from August 15, 2017 through March 15, 2018; and their last payment was for the period from July 15 through August 15, 2017. The Tenants denied or had insufficient information regarding the remaining allegations in counts I and II.

¶ 9 The Tenants asserted several affirmative defenses including constructive eviction, failure to mitigate damages, breach of implied warranty of habitability, and breach of implied duty of good faith and fair dealing.

¶ 10 The matter proceeded to arbitration, where the panel entered an award in favor of the Landlords. The Tenants timely filed a rejection of the award. The matter then proceeded to a bench trial.

¶ 11 At trial, Carrie Cox, a realtor, testified as follows. Cox first saw the house in September 2017 and noted several issues that needed repair including the badly stained carpet. Cox listed the house for sale as promptly as possible, on November 9, 2017. The house sold on February 5, 2018.

¶ 12 James Carrigan, the Landlords' contractor and owner of JHC Painting and Construction, testified as follows. Carrigan first saw the house in late September or early October 2017. Carrigan observed damaged trim, walls, and floors, including broken tiles in the kitchen and "destroyed carpet" in the front bedroom. According to Carrigan, "there was no cleaning that carpet," due to the "amount of staining, pet urine, wornoutness [*sic*], especially in the main living [room]. It was worn through to the crunch side on the back. *** The amount of staining, it would never have come clean." The urine odor came from the carpet upstairs and downstairs, although the odor was not as bad upstairs. The urine odor was consistent with the use of a catheter

by a quadriplegic dependent person. In addition, there were pet urine stains. Carrigan opined that the carpet did not look older than five years.

¶ 13 Carrigan also testified as follows. The home was extremely damaged, especially for the type of home and neighborhood. "[We] took out [b]roken trim, the doors, the carpet," and doorknobs and cut out and replaced squares of drywall. He identified several photographs as depicting the conditions he observed in the house, including marks and damage to the walls and door frames consistent with wheelchair use. Carrigan removed debris from the house, including trash left by the Tenants. Carrigan completed the work in November 2017. Carrigan identified his invoice that totaled $14,150. The Landlords paid the entire invoice amount. The invoice showed a $9500 credit that indicated a prior payment made by the Landlords. Carrigan explained,

> "I'm not a carpet guy, so I general out my carpeting. So we took a payment for that so that way he was paid, and then we completed the project. And the final, after both the deposit and the carpet was installed plus what was left on the back of the invoice."

¶ 14 The invoice listed paint work at $5000 and stated,

> "[P]aint the entire home. All rooms on first and second floor 2 coats on walls and ceiling. Prime as needed all paint will come[e] from pig paints in [E]lgin[.] Also includes basement[.]"

The invoice listed "Carpet install" at $7000 and stated,

> "Install new carpet [o]n first floor [a]nd entire second floor[;] includes all the bedrooms and hallways on second floor as [well] and both stair wells."

The invoice listed "wet carpet removal" at $300, "dumpster rental" at $500, "drywall" at $400, "doors" at $200, "paint prep" at $300, "kitchen flooring" at $450 and stated that this included replacing six tiles and regrouting the entire kitchen floor.

¶ 15    During cross examination, Carrigan testified that he first saw the house on September 27, 2017.    Carrigan did not know how long the old carpet had been in the house.

¶ 16    Dawn Seyl testified as follows.    Dawn and her husband Joseph owned the house during the time the Tenants occupied it.    The Tenants began occupying the house in March 2013.    Dawn identified the original lease.    The rent was $1900 due on the 15th of each month, beginning on March 15, 2013.    The Tenants also provided the Landlords with a $1900 security deposit as provided in the lease.    In the final negotiations of the lease renewal, Dawn told the Tenants that she and her husband's goal was to sell the house.    The Tenants told Dawn that they did not want the Landlords to sell the house.    The Tenants insisted on a one-year renewal term instead of a six-month term offered by the Landlords.    The Tenants told Dawn that they wanted a one-year renewal term because "the government runs slow and they needed to wait to get the results of their court - - whatever was taking place with their son."    The Tenants' son, Max, was in the military and had a lawsuit and they needed money to buy a home.    The Landlords agreed to a one-year lease extension that would end in March 2018.    When the parties executed the lease extension, Max was not living with the Tenants.

¶ 17    According to Dawn, on July 13, 2017, the Tenants told her that they were closing on their house on July 17, 2017.    In an email exchange admitted into evidence, Dawn attempted to schedule a walkthrough of the house with the Tenants.    The Tenants responded that they were moving out on or about August 1, 2017, and then they would take a couple of weeks to clean out the house.    On August 5, 2017, Dawn sent the Tenants an email stating that her husband would

be coming to the house the next day to mow the lawn and go through the house. Achim emailed Dawn the same day stating that the Tenants were still "in the [midst] of moving and wanting to clean [the house] up a bit." On September 14, 2017, Dawn received an email from the Tenants' attorney that the Tenants had "officially" moved out of the house. The Tenants offered to have their daughter, Tiffany, and her friends sublease the house. According to Dawn, the Landlords declined this offer because "on two occasions we had to do repairs based on Tiffany not closing the shower curtain upstairs [which] caused damage to the ceiling. Not once but twice we had to fix it."

¶ 18    Dawn testified about the damage to the house in September 2017 as follows. Tile was chipped in the kitchen and hallway; the carpet in the bedrooms was black and "chewed," beyond normal wear and tear; there were holes in the wall and door trim, a dent in the refrigerator, and the blinds were damaged; the house was all wood and the wood was damaged; and the bathrooms and kitchen were "filthy." The Tenants never asked the Landlords to modify the house to accommodate Max who was in a wheelchair. Dawn testified that photos taken in September 2017 were accurate depictions of the house. Dawn testified regarding the necessary repairs. The tile and carpet were replaced, holes were patched, but the wood could not be replaced because "they did not make it anymore." The Landlords sold the house on or about February 5, 2018. Dawn testified that the Tenants owed $10,766 in rent for the period of August 15, 2017, through February 15, 2018.

¶ 19    During cross-examination, Dawn testified as follows. The Tenants occupied the house from March 2013 through July 2017. The lease listed Max as an occupant of the house. Dawn was aware that Max had an auto accident and had become a quadriplegic, ventilator-dependent person. Regarding the repairs made to the house, Dawn testified that she paid $5000 for painting

the interior of the property, $300 for carpet removal, and $7000 for new carpet. The Landlords did not try to find a sublessor because they "were putting the property up for sale." The first time they "saw the damages" to the house was in August 2017, but they may have done a "walk through" of the property on July 12, 2017. The invoice for repairs did not breakdown which repairs and costs were for the upstairs, main floor, and basement. Most of the wall damage on the main floor was done by Max's wheelchair. From August 12 through September 27, 2017, the Landlords did nothing to repair the property. In an email, on August 6, 2017, Dawn wrote the Tenants that the final walk through of the house would take place at the end of the lease close to March 15, 2018.

¶ 20    Joseph Seyl testified as follows. He identified several photographs as depicting the house at the time the Tenants took possession in March 2013. Joseph testified that in December 2015 the Tenants called him to make repairs to the living room ceiling caused by water leaking from the upstairs bathroom. Upon inspection, Joseph discovered the leak was caused by the shower curtain not being closed properly. When asked about the possibility of subleasing to the Tenants' daughter, Tiffany, and her friends, Joseph replied that he and Dawn would not agree to the sublease because Tiffany caused damage to the house and that no information was provided regarding her friends. The Tenants did not ask for repairs or changes to the house to accommodate Max. The Tenants were given keys to the house in March 2013 when they took possession, but the Tenants did not return the keys.

¶ 21    During cross-examination, Joseph testified as follows. The carpet in the house was not new when the Tenants moved in. Before the Tenants moved into the house, the Landlords' family lived in the house for about fifteen years and the Landlords had replaced the carpet once during that time. The carpet had been replaced more than two years but less than five years before

the Tenants moved in. Joseph agreed with the contractor's opinion that the carpet damage was consistent with wheelchair use.

¶ 22    Janine Birr testified on behalf of herself and her fiancé, Achim Gross, as follows. Janine and Achim moved into the house in March 2013 and moved out on August 1, 2017. She and Achim paid rent through August 15, 2017. The Landlords did not return the Tenants' $1900 security deposit. Achim's father and sons, Rex and Max, moved into the house in March 2013. Achim's daughter, Tiffany, lived at the house for "six months or so." Janine stated that the water leak in the shower was caused by a rusted pipe that Joseph fixed.

¶ 23    Janine testified that the parties discussed the last lease renewal in January 2017. The Landlords offered the Tenants a six- or twelve-month lease renewal. Janine testified,

> "At first we wanted to sign a six-month lease, but both Dawn and [Joseph], they had stated that they wanted to sell the home and they had wanted to open – they wanted us to open the home three months later to have home showings and have people come through the home so they can sell their home quickly."

Janine and Achim were not comfortable with people coming through the property because Max was on a ventilator and "it's easy to catch germs [and] we didn't want people *** to also see Max in his condition." Max was in a terrible car accident and after spending about one year in the hospital, he came back to live in the property in January 2017. Max became a quadriplegic and it was hard to move him and the family needed time. Janine testified that "we chose a 12-month lease, because with a six-month lease [the Landlords] wanted to bring people into the home to sell ASAP within a three[-]month period of time."

¶ 24    Janine also testified that she notified the Landlords that she and Achim had found a home to buy and that the seller wanted to close very quickly. The Landlords were "very congratulatory

towards us." On July 16, 2017, Dawn sent Janine an email stating that the Landlords decided to put the house up for sale. On July 17, 2017, Dawn sent Janine and Achim an email stating, "Good luck on your closing tomorrow." Janine and Achim offered to have Tiffany and some of her friends sublease the house, "and we would be responsible for the rent through the expiration of our lease." The Landlords refused the offer. The Landlords did not want to sublease, rather, they wanted to list the house for sale.

¶ 25    Janine testified that, on August 5, 2017, she sent Dawn an email stating that Janine and her family were "in the midst of moving" but they wanted to clean up a bit." In response, Dawn sent an email expressing an urgency in putting the house up for sale. After Janine and her family moved out of the property, she and Achim intended to hire someone to clean it between August 1 and 15, 2017. But Janine and Achim did not hire a cleaning service because "a few days after we had moved out it seems as though Dawn and [Joseph] had taken possession of the [house]. *** [W]e assumed we had possession of the house until August 15[, 2017], and that being that they were in the home, we thought, okay, let them clean the house. There is a security deposit of $1900 which they could use to clean."

¶ 26    Janine also testified as follows. On August 6, 2017, Janine and Achim received an email from the Landlords stating that they refused to do a walkthrough at that time and would, instead, do a walkthrough on March 15, 2018; the lease termination date. Janine stated that she and her family enjoyed living in the house; they moved out because of Max's condition. Max could only get around on the main floor due to his wheelchair.

¶ 27    During cross examination, Janine testified that Max did not live in the house before he joined the army in 2015. Max came to live in the house in January 2017. Janine and Achim asked the Landlords for keys to the house, but neither she nor Achim received them. On August

1, 2017, when Janine and her family moved out, they left one garage-door opener behind in the house and kept one garage-door opener. Janine did not recall whether she returned the other garage-door opener. When Janine and her family moved into the house in March 2013, the carpet was clean. While Janine and her family lived in the house, the carpet was cleaned four or five times. Janine did not clean the carpet when she vacated the property because "[w]e did not get a chance to do so."

¶ 28    Achim testified as follows. He never received keys to the house. He had access to the house through the garage. Achim's son, Max, lived in the house when the Tenants first moved in. Max joined the military and was then in a catastrophic car accident. After Max was released from the hospital, Achim trained to be Max's caretaker. Achim stated that before Max moved back into the house, the carpet looked clean. Later in Achim's testimony, he described the carpet when he moved in as "livable." After Max moved back into the house with a wheelchair, the carpet "got heavily stained from a lot of traffic inside the house": doctors, nurses, veterans' administration personnel, caretakers, "also, him going up and down, you know, from his room to the living room. So, yeah, it was a lot of – a lot of wear and tear on the carpet." The wheelchair had six wheels and weighed about 500 pounds. Max weighed about 200 pounds. Max required a catheter that caused a bad urine smell in the house. Achim asked the Landlords to install laminate flooring in Max's room, the living room, and the dining room, and Achim offered to pay half of the cost, but the Landlords refused. Achim intended to hire a professional cleaning crew after moving out but did not do so because the Landlords were already in possession of the house.

¶ 29    During rebuttal testimony, Dawn testified that the Tenants never requested keys to the house.

¶ 30    After closing argument, the court requested the parties to provide case law on the issue of acceptable wear and tear and continued the matter.    Subsequently, the court requested the parties to provide case law regarding "the landlord's duty to accept whatever mitigation the tenant provides" and other issues.    The parties provided memoranda to the court.

¶ 31    On April 4, 2017, the trial court rejected the Tenants' claims of breach of warranty of habitability and breach of good faith and fair dealing.    The court found for the Landlords on count I of their complaint alleging breach of lease terms; failure to pay rent.    However, the court found that the Landlords failed to mitigate their damages from November 15, 2017, through February 5, 2018, the date the house sold.    The court, therefore, found the Tenants liable for unpaid rent only from August 15, 2017, through November 15, 2017, and awarded the Landlords $5700 in rent.

¶ 32    Regarding count II, alleging damage to the house, the court found that "the carpet had to be replaced due to more than normal [and excessive] wear and tear *** due to the wheelchair damage."    The court found that "both the landlord[s] and [the Tenants] should carry 50 percent of the repairs."    Therefore, the court awarded the Landlords $7050 for repairs plus $350 for court costs.    Subsequently, on April 24, 2019, the court awarded the Landlords $7000 in attorney fees.

¶ 33    The Tenants filed their notice of appeal on May 1, 2019.    The Landlords filed a cross-appeal on May 9, 2019.

¶ 34                                        II. ANALYSIS

¶ 35                                    A. Mitigation of Damages

¶ 36    The Tenants urge us to vacate the trial court's award of $5700 for unpaid rent, arguing that (1) the court erred as a matter of law in its interpretation and application of the landlord's statutory duty to mitigate damages under section 9-213.1 of the Code of Civil Procedure (Code) (735 ILCS

5/9-213.1 (West 2018)) and case law, and (2) the trial court erred by failing to find that the Landlords did not mitigate damages due to their unreasonable delay in repairing the house.

¶ 37    We review *de novo* questions of law and statutory interpretation.   *In re Christopher K.*, 217 Ill. 2d 348, 363-64 (2005).   After a bench trial, a trial court's findings of fact will not be disturbed unless they are against the manifest weight of the evidence.   *Jameson Real Estate, LLC v. Ahmed*, 2018 IL App (1st) 171534, ¶ 59.   "A decision is against the manifest weight of the evidence only when an opposite conclusion is apparent or when the findings appear to be unreasonable, arbitrary, or not based on the evidence."   *Eychaner v. Gross*, 202 Ill. 2d 228, 252 (2002).   "The manifest weight of the evidence standard affords great deference to the trial court because the trial court is in a superior position to determine and weigh the credibility of the witnesses, observe witnesses' demeanor, and resolve conflicts in their testimony."   *Wade v. Stewart Title Guaranty Co.*, 2017 IL App (1st) 161765, ¶ 59.   Under this standard, we may not reweigh the evidence presented to the trial court or make an independent determination of the facts. *Jameson Real Estate*, 2018 IL App (1st) 171534, ¶ 59.

¶ 38    Section 9-213.1 of the Code provides:

> "Duty of landlord to mitigate damages.   After January 1, 1984, a landlord or his or her agent shall take reasonable measures to mitigate the damages recoverable against a defaulting lessee."   735 ILCS 5/9-213.1 (West 2018).

¶ 39    The purpose of section 9-213.1 of the Code "is to require a landlord to undertake reasonable efforts to relet the premises after a defaulting tenant departs, rather than allowing the premises to stand vacant and then attempting to collect the lost rent in the form of damages."   *Danada Square, LLC v. KFC National Management Co.*, 392 Ill. App. 3d 598, 609 (2009).   The landlord bears the burden of proving that it complied with the statutory duty of mitigation.   *Id*. at 608.

¶ 40    Here, the Tenants contend that the trial court "was confused" and "improperly assigned a portion of [the] duty [to mitigate] on [the Tenants]."   The Tenants note that the court stated that the Tenants "had a duty to be – to try and find and sublet or to do something, and they did not completely carry forth."   We determine that the court misspoke to the extent that it implied that the Tenants had a duty to mitigate damages.

¶ 41    However, the trial court's finding regarding the Landlords' duty to mitigate damages was legally proper and not against the manifest weight of the evidence.   The record clearly shows that the Tenants breached the lease that ran from March 15, 2017, through March 15, 2018, when they stopped paying rent through August 15, 2017.   The Landlords sought seven months of unpaid rent or $11,400.   But the trial court did not award the Landlords this entire sum.   The court reasoned that the Landlords failed to mitigate damages once the house was repaired on or about November 15, 2017, through the time the house sold on February 5, 2018, because during that time, the Landlords listed the house for sale instead of attempting to relet it.   Thus, it is clear that the court understood that the Landlords had a duty to mitigate damages.   For these reasons the court awarded the Landlords only half of the unpaid rent they sought.   Accordingly, the court's findings show that the court understood the law, including that the doctrine of mitigation concerns "the *measure* of damages, [and] not the legal right to recover damages.   (Emphasis in original.) *St. George Chicago, Inc. v. George J. Murges & Associates*, Ltd., 296 Ill. App. 3d 285, 293 (1988).

¶ 42    The Tenants argue that the Landlords' duty to mitigate arose in July 2017 because the Tenants told the Landlords that they had purchased a home on July 1, 2017.   However, the Tenants paid rent through August 15, 2017; the Tenants' emails establish that, although they had moved out on August 1, 2017, they intended to take two weeks to clean the house; the first week of August, the Tenants' son, Rex, cleaned out the garage; and the Tenants state in their brief that

they vacated the house in "early August." Thus, we reject the Tenants' argument that the Landlords' duty to mitigate started in July.

¶ 43 In addition, the Tenants argue that the Landlords delayed mitigation by waiting until the end of September 2017 to begin repairs on the house. After reviewing the record, we determine that the trial court found, by implication, that the Landlords took a reasonable amount of time to begin and complete the repairs.

¶ 44 In their cross-appeal, the Landlords argue that the trial court erred by failing to award them rental damages until the property was sold. The Landlords urge us to award them an additional $5087 for rent from November 15, 2017, through February 5, 2018. Here, the trial court found that the Landlords failed to mitigate their damages by listing the house for sale instead of attempting to relet it.

¶ 45 As stated above, a landlord has a duty to take reasonable measures to mitigate damages. 735 ILCS 5/213.1 (West 2018); *St. George Chicago, Inc.*, 296 Ill. App. 3d at 292. The phrase "reasonable measures" is not defined in the statute or relevant case law. *JMB Properties Urban Co. v. Paolucci*, 237 Ill. App. 3d 563, 568 (1992). Whether a landlord has taken reasonable measures to mitigate damages is a question of fact. *Danada Square, LLC.*, 392 Ill. App. 3d at 607.

¶ 46 Implicit in the trial court's finding and award is that the Landlords' placing the house for sale rather than attempting to relet it was not a reasonable measure. The issue for us is whether the trial court's finding is against the manifest weight of the evidence. Although the Landlords were entitled to exercise their business judgment by listing the house for sale, the Landlords cannot compel the Tenants to bear the costs of their decision when they may have avoided those costs altogether by attempting to relet the house. See *Danada Square, LLC.*, 392 Ill. App. 3d at 609

(the landlord failed to take reasonable measures to mitigate damages where it insisted on a 60-day termination provision in a replacement lease). Accordingly, we determine that the trial court's finding regarding the Landlords' failure to mitigate damages from November 15, 2017, through February 5, 2018, is not against the manifest weight of the evidence.

¶ 47 The Landlords cite *JMB Properties Urban Co.*, 237 Ill. App. 3d 563, to support their argument. In that case the appellate court held that the landlord of a mall took reasonable measures to mitigate damages where it relet the space to the first available tenant seven months after the previous tenant vacated. *Id*. at 568-69. The landlord actively sought a new tenant and relet the space prior to leasing other available spaces in the mall. *Id*. at 568. Here, the Landlords did not seek a new tenant, but made a business decision to sell the house. Thus, *JMB Properties Urban Co.* is distinguishable from our case.

¶ 48                                  B. Reasonable Wear and Tear

¶ 49 The Tenants argue that the trial court's award of damages for excessive wear and tear is unsupported by the evidence because the carpet and walls were only damaged in certain parts of the house. The Tenants contend that the evidence, including the contractor's invoice, was insufficient because it did not itemize the charges for painting, carpet, and tile damaged by Max's wheelchair and, therefore, the invoice is insufficient to prove actual damages. Conversely, in their cross-appeal, the Landlords argue that the trial court erred by failing to award the entire amount indicated on the contractor's invoice ($14,150), because this represents the cost to repair the damage caused by the Tenants.

¶ 50 A trial court's decision as to damages will not be disturbed upon review unless it is manifestly erroneous. *Lynch v. Precision Machine Shop, Ltd.*, 93 Ill. 2d 266, 278 (1982). Fixing the amount of damages is preeminently the function of the fact finder, and its determination

will not be disturbed unless it is obviously the result of passion and prejudice. *Pioneer Trust & Savings Bank v. Zonta*, 96 Ill. App. 3d 339, 345-346 (1981). As a general proposition, damages may be proven in any reasonable manner. *Razor v. Hyundai Motor America*, 222 Ill. 2d 75, 108 (2006). However, damages in a breach of contract action must be proved with reasonable certainty and cannot be based on conjecture or speculation. *Kirkpatrick v. Strosberg*, 385 Ill. App. 3d 119, 130 (2008). The burden of proof of damages is on the plaintiff, not on the defendant. *First National Bank v. Dusold*, 180 Ill. App. 3d 714, 418 (1989).

¶ 51     Paragraph 10 of the lease provided in relevant part:

> "On termination of the lease, Tenant shall return the residence to Landlord in like condition, reasonable wear and tear excepted. If Tenant fails to keep the residence in such condition and repair, Landlord and Landlord's agent may enter and put the residence in good condition and repair. On demand, Tenant shall pay Landlord the cost of such work."

¶ 52     A vacating tenant has no duty to pay for capital improvements that add value to the property. *Northwest Commerce Bank v. Continental Data Forms, Inc.*, 233 Ill. App. 3d 124, 126-127 (1992). However, if the condition of the premises is not the same at the end of a tenancy as at the beginning, the landlord may hold the tenant liable for the costs to return the premises to a condition acceptable for rental. *Id*. *Pyramid Enterprises, Inc. v. Amadeo*, 10 Ill.App.3d 575, 579 (1973). The landlord has the discretion to decide how to fix the repairs, but he must supply a reasonable basis for his damage computation. *Northwest Commerce Bank*, 233 Ill. App. 3d at 126-127, 129).

¶ 53     Here, the Landlords presented photos of the house taken before the Tenants took possession and photos taken after the Tenants vacated. The house was in very good condition before the Tenants moved in. The photos taken after the Tenants moved out show excessive damage to

numerous walls, including large holes, missing plaster and drywall from door frames, and significant scrapes. The photos also show a badly cracked kitchen ceramic tile floor, and badly worn, and, in some areas, destroyed carpet. Achim testified that the damage to the kitchen tile was caused by "an 800[-]pound wheelchair driving around." Achim also testified that the wheelchair damaged the carpet and door frames, and Achim made holes in the walls for various reasons. Achim testified that the carpet was badly worn and stained upstairs and downstairs. Further, the carpet was damaged by urine. The contractor testified that the carpet was completely worn through and uncleanable, and needed to be replaced. The photos also showed other damages that were not indicated on the contractor's invoice including damaged window treatments and toilets. The trial court found that the damage to the house was "mainly due to excessive wheelchair use."

¶ 54    However, the Landlords failed to present any evidence to justify the replacement of carpet throughout the entire house. There was no evidence that the Tenants damaged the carpet in the basement. Similarly, the Landlords failed to present evidence that it was necessary to paint the entire house including the ceilings. There was no evidence that the Tenants damaged the paint in every room, on every floor, and on all the ceilings. In light of all of the evidence and lack thereof, we determine that the trial court's award of half of the contractor's invoice, $7050, was not manifestly erroneous.

¶ 55                              C. Attorney Fees

¶ 56    The Landlords argue that the trial court erred by failing to award them all of their attorney fees in the amount of $12,734. The Tenants contend that the Landlords failed to preserve the record regarding this issue for review by failing to provide a transcript of the hearing on the Landlords' fee petition. The Landlords, as the cross-appellants, had the duty of providing this

court with a sufficiently complete record of the proceedings below to support their claim of error. *Midstate Siding & Window Co. v. Rogers*, 204 Ill. 2d 314, 319 (2003) (citing *Foutch v. O'Bryant*, 99 Ill. 2d 389, 391-92 (1984)). The record before us is void of any transcript from the hearing on the fee petition, or any acceptable substitute such as a bystanders report, or an agreed statement of facts (Ill. S. Ct. R. 323 (eff. July 1, 2017)). Therefore, we are unable to determine on what basis the trial court awarded the amount of attorney fees now being challenged. Accordingly, we must presume that the trial court's ruling had a sufficient factual basis and was in conformity with the law. See *Foutch*, 99 Ill. 2d at 393 (without transcript of proceedings or bystanders report, the reviewing court must presume the trial court's ruling was in conformity with the law). Thus, we cannot say that the trial court abused its discretion in its award of the attorney fees.

¶ 57    For the foregoing reasons, the judgment of the trial court is affirmed.

¶ 58                                III. CONCLUSION

¶ 59    The judgment of the circuit court of Kane County is affirmed.

¶ 60    Affirmed.